# Supreme Court of Texas

No. 22-0179

Texas Tech University Health Sciences Center – El Paso,

*Petitioner*,

v.

Dr. Lindsey Niehay,

*Respondent*

On Petition for Review from the
Court of Appeals for the Eighth District of Texas

JUSTICE BLACKLOCK, joined by JUSTICE DEVINE and JUSTICE YOUNG, concurring.

I agree with the Court's interpretation of Chapter 21 of the Texas Labor Code. Excessive weight is a physical characteristic, not a disability. Excessive weight may be a symptom of an underlying physiological impairment, in which case the underlying physiological impairment—not the weight itself—may qualify as a disability and thereby trigger Chapter 21's employment protections. *Ante* at 13. I write separately regarding two notable aspects of the Court's approach to interpreting the statute.

First, the Court rightly rejects calls to interpret the Labor Code's use of the words "disability" and "impairment"—or the related words "disorder" and "condition"—by consulting the evolving medical understanding of these terms.[1]  As the Court observes, "[w]hether obesity is considered a disorder in the medical community says little of whether morbid obesity qualifies as an impairment under the Labor Code." *Ante* at 15.  I would add that whether obesity is considered an impairment—or a disability, disorder, condition, or anything else—by the medical community in 2023 says nothing about whether obesity qualifies as a disability or impairment under Labor Code provisions enacted in 1993.

The Labor Code is a legal text, not a medical diagnostic guide.  Its relevant provisions regarding disability discrimination are found in Chapter 21.  The meaning of those provisions, including their use of the disputed word "impairment," must be the same today as it was in 1993, when the provisions were enacted.  Like all other statutes, the meaning of this statute was fixed at the time of its enactment.  *See Thompson v. Tex. Dep't of Licensing & Regul.*, 455 S.W.3d 569, 570 (Tex. 2014) (statutory terms have their "plain meaning as commonly understood at

---

[1] *See, e.g.*, Resp. Br. on the Merits, at 27 ("Texas Tech dismisses the current medical consensus as based on factors other than medical science.  This Court should not so cavalierly dismiss the scientific research findings and science-based consensus of the medical community."); *id.* at 28 ("What is relevant is that medical science classifies obesity as a disorder."); *id.* at 24 ("Under current medical science, morbid obesity is an impairment.  The consensus of the medical community and scientific research is that obesity is a physiological medical disorder.").

the time of enactment"). Unlike changes to medical diagnostic conventions, changes to statutes require the consent of the governed.

A court's job is to interpret statutory terms to "mean what they conveyed to reasonable people *at the time they were written*." Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 16 (2012) (emphasis added). It is therefore "a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary . . . meaning . . . at the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (internal citations omitted). Yet to call this fundamental rule a mere "canon of construction" does it a disservice. The rule that a statute's meaning is fixed at enactment is not just a tool courts employ along with various other tools for the interpretation of difficult legislative text. Instead, the rule is dictated by the very nature of statutes and their role within our constitutional order.

When the Legislature enacts a statute and the Governor does not veto it, the State has exercised its sovereign power to create new legal obligations. Often, as in Chapter 21 of the Labor Code, that power is employed to restrict liberty in the name of the public good. By ratifying the Constitution, the People of Texas—from whom all the State's sovereignty derives[2]—consented to restrictions on their liberty imposed

---

[2] TEX. CONST. art. I, § 2 ("All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit. The faith of the people of Texas stands pledged to the preservation of a republican form of government, and, subject to this limitation only, they have at all times the inalienable right to alter, reform or abolish their government in such manner as they may think expedient.").

by duly enacted legislation, subject to the Constitution. When we insist that statutes have only the meaning their words would have had to a reasonable citizen at the time of enactment, we are taking care to impose only those restrictions on liberty that have achieved the consent of the governed through the constitutionally prescribed process. For instance, if we insist that the Labor Code's prohibition on disability discrimination must mean today exactly what it would have meant to a reasonable citizen who carefully read its text in 1993, we give effect to the 73rd Legislature's decision to protect disabled employees without imposing additional legal obligations that would not have been within the reasonable contemplation of those in a position to influence the measure's enactment in 1993.

To lose sight of the fixed-meaning rule would be no mere linguistic or interpretive error. It would alter the role statutes play in our system of government and undermine the foundational principle that our statutory obligations have obtained the consent of the governed. Departure from the fixed-meaning rule converts the statute's imposition of a discrete legal obligation that achieved the consent of the governed at a discrete time in history into an invitation for courts and executive-branch agencies to use contemporary understandings of the statute's text to impose restrictions on liberty for which popular consent was never obtained.

If we give a statute a meaning today that we know would have been outside the contemplation of reasonable readers of its text at the time of enactment, there is no sense in which the obligations we impose in the statute's name have ever achieved the consent of the governed.

That very consent, however, is what gives the statute its political legitimacy. Legislators and their constituents can only support or oppose legislation *today* based on what they understand its text to mean *today*. They can hardly be expected to anticipate how future generations of judges and bureaucrats will understand the text.

When courts or agencies treat statutes like "living" documents that evolve over time as judges' understanding of the statutory words evolves, they replace the consent of the governed with the will of the governors. Whether dressed up in the garb of textualism or not, any approach to statutory interpretation that yields results that reasonable citizens who carefully read the text at the time of enactment would not have anticipated is not just methodologically erroneous; it is constitutionally illegitimate.

I therefore agree with the Court's refusal to consider contemporary medical understandings of how to categorize obesity, morbid or otherwise. The question is whether, in 1993, excessive weight that lacks any underlying physiological cause was within the meaning of the word "impairment" as used in the Labor Code's definition of "disability."[3] The question is not what "impairment," "disability," or any other word means in today's medical parlance.

---

[3] Even when the Legislature defines a term, such as "disability," our understanding of the definition may be informed by the common meaning of the word being defined. *Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, 591 S.W.3d 127, 135 (Tex. 2019) ("In applying [the statutory] definition, we should not ignore altogether the common meaning of the words being defined, unless the statutory text compels otherwise."). This is especially true when the operative word in the definition—"impairment"—is no more illuminating than the word it defines—"disability."

This case turns on whether "morbid" obesity qualified as a disability when the statute was enacted. That question turns on whether it was an "impairment," which the statute does not define. As the majority opinion observes, there is no shortage of evidence from the time of the statute's enactment and shortly thereafter, including from federal cases interpreting the same language, that obesity (unless accompanied by an underlying physiological disorder) was regarded as a physical characteristic, not a "disability."[4]

\* \* \*

Second, I agree with the Court that Texas judges interpreting Chapter 21 of the Texas Labor Code have an "independent obligation to construe Texas law" that does not "yield" to "statement[s] made by federal authorities" about federal anti-discrimination statutes. *Ante* at 12. The parties' briefing, however, focuses almost entirely on federal law, and I am concerned that this Court's frequent reliance on federal

---

[4] *See, e.g.*, *Francis v. City of Meriden*, 129 F.3d 281, 286 (2d Cir. 1997) ("Obesity, except in special cases where the obesity relates to a physiological disorder, is not a 'physical impairment' within the meaning of the statutes[.]"); *Andrews v. State of Ohio*, 104 F.3d 803, 810 (6th Cir. 1997) ("Because a mere physical characteristic does not, without more, equal a physiological disorder, where an employee's failure to meet the employer's job criteria is based solely on the possession of such a physical characteristic, the employee does not sufficiently allege a cause of action under these statutes. To hold otherwise would (to paraphrase the Fourth Circuit) distort the 'concept of an impairment [which] implies a characteristic that is not commonplace' and would thereby 'debase [the] high purpose [of] the statutory protections available to those truly handicapped.'"); *Cook v. State of R.I., Dep't of Mental Health, Retardation, & Hosps.*, 10 F.3d 17, 24 (1st Cir. 1993) (concluding that the plaintiff's morbid obesity could be considered a disability because the record showed that it was caused by an underlying physiological disorder).

6

law to aid its interpretation of Chapter 21 may have given the wrong impression.

The Court today helpfully clarifies that federal law only "assists" Texas courts in the discharge of our "independent obligation" to correctly interpret the text of Chapter 21. *Id.* Yet when all the litigants seem to be under the impression that evolving statements about federal law by federal judicial and executive-branch officials are this Court's primary touchstone for understanding the meaning of a Texas statute, something is amiss. This Court has frequently said that its interpretation of Chapter 21 should be "guided" by federal case law interpreting analogous federal statutes. *See, e.g.*, *Tex. Dep't of Transp. v. Lara*, 625 S.W.3d 46, 52 (Tex. 2021). The textual basis for this approach is Chapter 21's statement of purpose: "The general purposes of this chapter are to . . . provide for the execution of the policies embodied in Title I of the Americans with Disabilities Act of 1990 and its subsequent amendments." TEX. LAB. CODE § 21.001(3).[5]

I acknowledge the possibility that this textual purpose statement opens the door to greater consideration of federal law than would otherwise be proper when interpreting a Texas statute. And I acknowledge that there are good prudential reasons to avoid imposing two overlapping and conflicting anti-discrimination regimes on Texans. "But we have never said that the general purposes provision requires [Chapter 21] to forever remain identical to Title VII, regardless of

---

[5] *See also* TEX. LAB. CODE § 21.001(1) (professing Chapter 21's purpose to "provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments").

subsequent congressional amendments to the federal act." *Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 507 (Tex. 2012). "Rather, we consider the plain terms of [Chapter 21] and our precedent, and look to federal law for guidance only when the relevant provisions of Title VII are analogous." *Id.*

A question raised by this Court's past statements about the interplay between Chapter 21 and federal statutes is what it means to look to federal law "for guidance." Like the word "impairment," the word "guidance" has play in the joints. If it means that federal law is a guiding light to be followed as Texas courts interpret Chapter 21, then I must object. If, however, it means we are guided by helpful ideas from federal sources just as we would be guided by helpful ideas from any other knowledgeable source, such as parties or amici curiae, then I have no objection. I agree with the Court's statement today that federal sources of law "do not bind us," but instead merely "assist" us, in the discharge of our "independent obligation" to understand what a reasonable Texan who carefully read Chapter 21 at the time of its enactment would have thought it meant. *Ante* at 12. Courts often need assistance in understanding a statute. Naturally, we may consult the non-authoritative opinions of judges or federal agencies for assistance, just as we may consult the views of the parties or of amici curiae.

Chapter 21's legislative statement of purpose requires nothing more. *See* TEX. LAB. CODE § 21.001. It imposes no formal obligation on Texas courts, not even a weak one, to follow the federal judiciary's understanding of federal statutes. Nor does it require us to give evolving regulations or "guidance" issued by the Equal Employment Opportunity

8

Commission any important role in our understanding of the state-law obligations imposed by Chapter 21. Section 21.001's statement of purpose does not, even on its own terms, attempt to tie Chapter 21 to the mast of evolving federal anti-discrimination law. As with any statute, "the policies embodied in Title I of the Americans with Disabilities Act of 1990" are found in the federal statutory text. 42 U.S.C. §§ 12101, *et seq.* The statutory text is the policy, and the meaning of that text was fixed at its enactment. *New Prime*, 139 S. Ct. at 539. Later statements by federal courts or agencies cannot alter "the policies embodied in Title I" as they were understood in 1993, when section 21.001's purpose clause was enacted. At most, section 21.001 expresses the Texas Legislature's general support for how the federal statutory text was understood in 1993.

That being the case, Chapter 21's statement of purpose is best viewed as the Legislature's way of saying, "We understand the text we have enacted to do essentially the same thing as what we understand the current text of 42 U.S.C. §§ 2000e, *et seq.*, to do." It is not the Legislature's way of saying, "Texas courts should follow developments in the interpretation of federal law by federal courts and agencies." If that were the purpose statement's import, then we should ignore it entirely. It would be an invitation to abandon our fundamental obligation to give effect to the text of Chapter 21 as it would have been understood at the time of enactment. It might even be an

9

unconstitutional delegation of legislative authority to federal courts and agencies that are not politically accountable to the People of Texas.[6]

When Texas courts look to federal sources of law for assistance in understanding Chapter 21, we should take care not to give the impression that we are elevating federal law to the level of controlling authority that must be carefully parsed and assiduously followed. Federal sources of law have no formal role to play, in this case or in future cases, as this Court seeks to understand whether the various legal obligations that might be imagined to arise from Chapter 21 of the *Texas* Labor Code have truly achieved the consent of the governed in Texas.

* * *

Extending Chapter 21's prohibition on disability discrimination to the obese would have substantial social and economic consequences. Such a rule might render 50% of the population disabled by 2030. Zachary Ward et al., *Projected U.S. State-Level Prevalence of Adult Obesity and Severe Obesity*, 381 NEW ENG. J. MED. 2440, 2447 (2019). If

---

[6] The purpose clause's reference to "subsequent amendments" is not an invitation to incorporate evolving understandings of the federal statutes into the Texas statutes. Instead, the words "and its subsequent amendments" were added by the Texas Legislature in 1995 after Congress amended the ADA. *See* Act of Apr. 25, 1995, 74th Leg., R.S., ch. 76, § 9.01(a), sec. 21.001, 1995 Tex. Gen. Laws 458, 621 (Texas amendment); Civil Rights Act of 1991, Pub. L. 102–166, § 12111, sec. 109(a), 105 Stat. 1071, 1077 (1991 federal amendment). The "subsequent amendments" to the federal ADA of 1990 are those that Congress had already made when the Texas Legislature added the "subsequent amendments" language in 1995. The reference in Chapter 21's purpose clause to "subsequent amendments" is therefore not a prospective endorsement by the Texas Legislature of future amendments to (or changes in the understanding of) the federal statutes. It is a retrospective approval of amendments already made by Congress to the federal statutes.

only the "severely" obese were covered, then perhaps 25% of the population may be disabled by 2030. *Id.*[7] As the Court's opinion makes clear, the prevailing understanding to this point has been that existing disability-discrimination statutes do not extend their protections to the physical characteristic of excess weight. If the Legislature decides to extend Chapter 21's protections in this way, the courts will enforce it, subject to the Constitution. But on a matter of such "vast economic and political significance," we should expect the Legislature to "speak clearly." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 142 S. Ct. 661, 665 (2022) (quoting *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021)).

Chapter 21's current text does not dictate with any degree of clarity that excessive weight, on its own, qualifies as a disability. I agree with the Court that the best interpretation of the statutory text is that physical characteristics like weight are not protected. If that is to change, then the Legislature—not the courts—should say so.

---

[7] The cited study defined "severe obesity" as a body-mass index (BMI) of 35 or higher. *Id.* BMI is a standard medical measurement that involves comparing a person's height to his weight using a surprisingly complicated formula. *See* Cleveland Clinic, *Body Mass Index (BMI)*, https://my.clevelandclinic.org/health/articles/9464-body-mass-index-bmi (last updated May 9, 2022). Definitions of "morbid obesity" appear to vary. *Compare* Ayşe Polat et al., *The effect of morbid obesity (BMI ≥ 35 kg/m²) on functional outcome and complication rate following unicompartmental knee arthroplasty: a case-control study*, J. ORTHOPAEDIC SURGERY & RSCH. 1, 8 (2019) (using BMI of 35 as proxy for "morbid obesity"), *with* Liene Bervoets & Guy Massa, *Defining morbid obesity in children based on BMI 40 at age 18 using the extended international (IOTF) cut-offs*, PEDIATRIC OBESITY 94, 98 (2014) (using BMI of 40).

_____
James D. Blacklock
Justice

**OPINION FILED:** June 30, 2023